1

2

3

4

5

6

7                              **UNITED STATES DISTRICT COURT**

8                              **SOUTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10 THE ESTATE OF ALEX MARTIN, KAREN MARTIN, and CRAIG MARTIN, | CASE NO. 13cv1386-LAB (BGS) |
| 11 | **ORDER GRANTING SUMMARY JUDGMENT; AND** |
| 12                                    Plaintiffs, vs. | |
| 13 UNITED STATES OF AMERICA, et al., | **ORDER OF DISMISSAL** |
| 14                                    Defendants. | |

15

16          This case arises from the death of Alex Martin, who was tasered after he led Border

17   Patrol agents on a dangerous car chase. The tasering caused Martin's car to explode, killing

18   him.

19          Karen and Craig Martin filed this suit on their own behalf and on behalf of their late

20   son's estate. Their Fourth Amended Complaint alleges five claims under *Bivens v. Six*

21   *Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against

22   United States Border Patrol Agents Roy J. Salcedo, Alex Fishman, Matthew Smith, and

23   Anthony Galioto ("Agents") for (1) excessive force, (2) wrongful death, (3) violation of their

24   right of association, (4) failure to intercede, and (5) failure to properly supervise and

25   discipline; and four causes of action against the United States under the Federal Tort Claims

26   Act (FTCA) for (1) wrongful death, (2) assault and battery, (3) negligence, and (4) excessive

27   force.

28   / / /

Defendants moved for summary judgment on all claims, arguing that qualified immunity shields the Agents on the *Bivens* claims, and that the FTCA claims also fail since the Agents acted reasonably.

## I.    Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if the evidence shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of showing that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If that burden is met, the burden shifts to the opposing party to establish through specific facts that there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the Court looks to evidence; mere allegations or arguments are not sufficient to withstand a motion for summary judgment. *Id.* Arguments in the briefing must be supported by specific citations to evidence; the Court is not required to search through the exhibits to find it. *Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (holding that failure to cite page and line numbers of exhibits offered in opposition to motion for summary judgment warranted court's exclusion of that evidence)*; Forsberg v. Pacific N.W. Bell Tel. Co.,* 840 F.2d 1409, 1418 (9th Cir. 1988) (holding a district court is "not required to comb the record to find some reason to deny a motion for summary judgment").

The evidence of the non-moving party is to be believed, and all reasonable inferences that may be drawn from the facts must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255.  The Court does not weigh the evidence or resolve disputed issues of fact. *Id.* at 249. Rather, the Court's role is to determine whether there is a genuine issue of material fact for trial. *Id.* Disputes about *immaterial* facts do not preclude summary judgment. *Lynn v. Sheet Metal Workers' Intern. Ass'n*, 804 F.2d 1472, 1483 (9th Cir. 1986).

### B.    Qualified Immunity

Qualified immunity protects government officials from civil liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Deciding whether an officer is entitled to qualified immunity is a two-step inquiry. First, the court assesses whether the plaintiff has alleged or shown a violation of a constitutional right. Second, the court decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.* at 232. District judges may use their discretion to decide which prong to address first. *Id.* at 236.

### C.  Excessive Force

Excessive force must be measured by the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Defendants' use of force must be "'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. This inquiry is highly fact specific. *Scott v. Harris*, 550 U.S. 372, 383 (2007).

Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and "must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 397. The reasonableness of the force used to effect a particular seizure is determined by carefully balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396.

Excessive force cases involving a suspect's death can pose special problems since the defendant officers are usually the only surviving witnesses, and so "the witness most likely to contradict his story — the [decedent] — is unable to testify." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). For this reason, a "judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* A "court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to

discredit the police officer's story . . . ." *Id.* The purpose of this standard is to allow the reconstruction of a decedent's version of events from circumstantial evidence. *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

A significant inconsistency can sometimes, but not always, create a genuine issue of material fact. *Compare Gonzalez v. City of Anaheim*, 747 F.3d 789, 792 (9th Cir. 2014), *and Reynolds v. Cnty. of San Diego,* 84 F.3d 1162, 1169–70 (9th Cir. 1996) (holding that a party's pointing out a minor inconsistency was insufficient to create a triable issue of material fact), *overruled on other grounds by Acri v. Varian Assocs., Inc.,* 114 F.3d 999 (9th Cir. 1997). A plaintiff cannot resist summary judgment by pointing to inconsistencies and inviting speculation about officers' motives; what officers knew and why they acted as they did must be established by competent evidence. *Gonzalez*, 747 F.3d at 797–98; *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003).

The officers' testimony is not the only available evidence here, however. The Court has the benefit of video footage of the events surrounding Martin's death.  In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court was confronted with a similar situation. On summary judgment, a plaintiff offered his own testimony about a car chase. But a videotape of the chase, whose accuracy and authenticity were unquestioned, showed the plaintiff's testimony could not be true. The Court held that it, and lower courts, were required to accept clear record evidence such as this, and the plaintiff's own discredited account did not create a triable issue of fact. *Id.* at 380–81 ("The Court of Appeals . . . should have viewed the facts in the light depicted by the videotape.") The authenticity and accuracy of the video are undisputed in this case, (Docket no. 66, ¶ 18), and the Court considers that evidence just as the Supreme Court did in *Scott*.

**D.    FTCA**

The FTCA provides that the United States may be held liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in

accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). California law applies because the events at issue occurred in California. *See Richards v. United States*, 369 U.S. 1, 7 (1962).

Generally, public employees in California "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions." *Hayes v. Cnty. of San Diego*, 57 Cal.4th 622, 628–29 (2013). To succeed on a claim for negligence under California law, a plaintiff must establish four elements: (1) duty; (2) breach; (3) causation; and (4) damages. *Nally v. Grace Comty. Church*, 47 Cal.3d 278, 292 (1988). "The Fourth Amendment's reasonableness standard applies to analyzing negligence claims related to excessive force by police officers." *Wynn v. San Diego Cnty.*, 2015 WL 472552, at *10 (S.D. Cal. Feb. 5, 2015).

In evaluating negligence liability, law enforcement's tactical conduct and decisions preceding the use of force may also be considered as part of the totality of circumstances, but only where that conduct or decision itself did not cause a separate injury. *Hayes*, 57 Cal.4th at 626.

## II.    Background

### A.    Undisputed Facts

Just after 1:00 a.m. on March 14, 2012, Alex Martin rented a blue Ford Focus in Dallas, Texas and began driving west to San Diego. (Docket no. 66 (Joint Statement of Undisputed Facts), ¶ 2.)  He came to the Pine Valley area of San Diego County, which is east of San Diego, late that night. (*Id.*, ¶ 4.)

That evening, the Border Patrol was patrolling east San Diego County near Interstate 8. (*Id.*, ¶¶ 5, 7–8, 13; Docket no. 62-3, ¶ 2.) The Agents are members of the Border Patrol Smuggling Interdiction Group (SIG), whose mission is to disrupt and prevent alien and narcotic smuggling operations. (Docket no. 66, ¶ 14; Docket no. 62-2, ¶ 2.) SIG agents wear plain clothes and ride in unmarked cars equipped with emergency lights and sirens. (*Id.*, ¶ 2.)

Around midnight on March 15, Agent Fishman was driving west on Interstate 8 when he saw a car driving west in the eastbound lane near the Pine Valley bridge. (*Id.*, ¶ 6, Docket

no. 68, 6:21–23.) Suspecting illegal smuggling activity and/or drunk driving, Fishman alerted fellow SIG members, and began following the car. (*Id.* at 6:22–7:1.)

He saw the vehicle make a U-turn and resume travel in the correct direction. He crossed the median to make a U-turn, and followed what he believed was the same car. (*Id.*, 7:13–15.) He saw what we now know was Alex Martin's car parked by the side of the interstate, near the Pine Valley exit. (*Id.*, 7:15–17.)  Believing the driver was transporting aliens or drugs, Agent Fishman pulled up behind the car and turned off his headlights to conduct further surveillance. (*Id.*, 7:17–19.)

Martin's car then headed down the exit ramp and ran a stop sign before again coming to a stop in a cul-de-sac near the Pine Valley exit. (*Id.*, 8:5–7) Agent Fishman followed him. (*Id.*, 8:15.) Martin then turned around and headed eastbound onto the Interstate 8 on-ramp. (*Id.*, 8:5–7.)   But before the car reached the highway, Agent Fishman activated his emergency lights, and the car stopped. (*Id.*) Agents James Thompson and Aron Marcellus were traveling on Interstate 8 and saw Martin's and Fishman's cars stopped. (Docket nos. 62-6, ¶ 3, 68:8:5–17.)[1] They parked on the shoulder dividing the on-ramp and Interstate 8, within Martin's view. ((Plaintiffs' Video Exhibit ("Video") 19, 27:07).)[2] Agents Salcedo and Galioto arrived soon after and parked next to Agent Fishman. (*Id.*)

Agent Fishman exited his car and began yelling for Martin to get out of the car. (Docket no. 68, 9:14–20.) What words Fishman used, whether he identified himself as a Border Patrol Agent, and whether his siren was activated, are disputed. All three agents pointed guns at him. (Docket no. 68, 1:21–25.)  But it's undisputed that Fishman ordered

---

[1] The evidence is in conflict regarding whether Marcellus and Fishman first saw the cars stopped in the cul-de-sac, or after Martin had driven onto the on-ramp and stopped. But for purposes of this motion it does not matter.

[2] From this point on, the Court has the benefit of video evidence from Agent Salcedo's dashboard camera, whose accuracy and authenticity are undisputed. *See Scott*, 550 U.S. at 379–81.  Plaintiffs submit a series of video exhibits, all of which are continuously time-stamped. For purposes of this Order, the Court notes the relevant portions. Exhibit 19 shows Agent Fishman initially stopping Martin on the on-ramp, starting at 26:57, and ending when Martin passed the Border Patrol checkpoint, at 29:54. Exhibit 18 shows Agents forcing Martin's car to stop, starting at 00:12, and ends with firefighters extinguishing the car fire, at 30:00. Other pertinent time frames are cited throughout this Order.

Martin out of the car. The video makes clear that a marked Border Patrol vehicle, as well as two other Border Patrol vehicles with flashing lights were stopped nearby, within Martin's view. (Video 19, 27:05.) While the video does not have sound, it does show the vehicles red and blue emergency lights flashing and clearly visible.  Martin then fled in his vehicle, and tried to evade them.  (Video 19, 27:13.) Plaintiffs have argued that he did so because he was afraid of them, not realizing they were law enforcement agents.

The Agents pursued him, their lights and sirens activated. (Docket no. 62-2, ¶ 10.) His speed varied, ranging from a complete stop on Interstate 8 to speeds of at least 70 miles per hour. (*Id.*, ¶¶ 10–11; Docket no. 62-6, ¶ 15.) The Agents maneuvered their vehicles in an effort to force him to pull over, but Martin continued to evade them. (Video 19, 27:57–28:05.)

A few seconds later, Martin abruptly swerved right and exited while crossing solid white traffic lines separating Interstate 8 and the on-ramp. (Video 19, 28:16.) Martin then passed a stop sign and merged onto Old Highway 80, a narrow two-lane highway. (*Id.*, 28:36–40.)  As he continued the chase, he crossed the yellow double lines into the oncoming lane at least three times, all while accelerating through blind curves. (*Id.*, 28:40–29:30.)  At one point, he sped into the opposite lane for about five seconds, nearly colliding head-on with an oncoming car. (*Id.*, 29:01–08)

A Border Patrol checkpoint was located not far ahead. It was well-lit and -marked, with many traffic cones with reflective markings, bright lights, and at least four marked Border Patrol cars, and was staffed by multiple agents. (*Id.*, 29:35–42.) As Martin drew nearer, Border Patrol agents deployed spike strips at the checkpoint. (Docket no.  62-5, ¶12.) As Martin's car approached the strips, he slowed, then swerved around them despite agents standing nearby. (Video 19, 29:40.)  Shortly past the checkpoint, Fishman drove next to Martin and managed to force him off the road. (Video 18, 00:00–25.)  Another vehicle parked ahead of Martin's car, while one parked behind. (*Id.*)

Border Patrol agents are trained that rushing a vehicle that could be transporting aliens is a technique that can be used when stopping a suspected smuggling vehicle. / / /

- 7 -

(Docket no. 62-2, ¶ 20.)[3]  Using this technique can help prevent aliens from escaping, prevent harm to aliens, and help identify the car's driver for purposes of prosecuting criminal smugglers. (*Id.*)  This rush technique helps bring an escalating situation under control as quickly as possible. (*Id.*; Docket no. 62-5, ¶ 16.) Consistent with their training, the Agents rushed Martin's car. Agent Salcedo tried opening the front passenger door, but it was locked, (Video 18, 00:32), and all four windows were shut. (Docket no. 68-20, p. 5.) The Agents ordered Martin to show his hands and get out of the car, (Docket nos. 68-13, 89:4–6; and 68-14, p. 15), all while at least three Agents paced back and forth behind it. (Video 18, 00:30–46.) Another agent, Agent Smith, was near the driver's side door.

Martin initially complied with orders to "show his hands." (Docket no. 68-13 (Smith Depo. Tr.), 89:4–6).) At that time, Agent Smith saw Martin had no weapons in his hands. (*Id.*, 92:6–10.)  Agent Salcedo says he saw Martin holding something in his right hand, though he did not believe it was a gun. (Docket no. 62-5, ¶ 16, 68-9, 183:24.) The evidence both parties cite shows that Martin then moved his hands around the car's center console, as if looking for something there. (Docket nos. 62-1,10:17–19 (citing Salcedo Decl., ¶ 22); 11:4–5 (citing Galioto Decl. ¶ 14), 11:14–19 (citing Smith Decl., ¶ 7); 68, 12:13–15, 38:4–9 (citing Smith Interview at 15).)[4] Plaintiffs suggest that Martin's movements were in response to Agents' commands to get out of the car on the passenger side, or else that he was confused

---

[3] Plaintiffs argue that the Agents were trained to conduct a different kind of maneuver, called a "hot stop," in these circumstances, and not to rush the car. (Docket no. 68, 26:19–21.) But they cite no evidence to support this argument. Nor do they show a "hot stop" was clearly more reasonable under the circumstances, or that use of the "rush" technique was unreasonable.

[4] The Salcedo Declaration says "I noticed that Martin, while sitting in the driver's seat, was moving his hands around the center console area . . . . I was concerned that Martin might have a weapon . . . ." (Docket no. 62-5, ¶16.) The Galioto Declaration says "I could see Martin's head, right shoulder and his arms reaching around the center console area." (Docket no. 62-3, ¶ 14.) The Smith Interview transcript says "[Martin is] putting his hands down. And he's messing with something either in the center or right behind the center, I'm not sure which." (Docket no. 68-14, at 15.)  Other evidence agrees with this. The Smith Declaration says "He [Martin[ focused his visual attention on the center console area, turned away from me and reached for something in that location." (Docket no. 62-7, ¶ 8.) The Fishman Declaration says " I could also see him [Martin] sitting in the driver's seat while hunched over looking for something in the center console area. I became concerned he might be looking for a gun . . . ." (Docket no. 62-2, ¶22.)

by their contradictory orders. (Docket nos. 68, 28:13–18, 38:4–9; 68, 12:5–6.) But the only evidence shows Martin reached for the console and then began moving his hands around as if looking for something there — not that he reached for the door. Plaintiffs concede that to open the passenger-side door, Martin would have to reach for that door. (Docket no. 68, 12:7–9.) And to roll down the windows, he would have to move his hand to the driver-side door. (*Id.*, 12:9–10.)[5]  In other words, Martin did not appear to be moving his hands into the console area in order to exit his car, or to comply with any order.

Agent Salcedo, using his flashlight, then broke the front passenger side window and, almost immediately, fired his taser at Martin. (Video 19, 00:45–49.)[6] The taser ignited gasoline fumes, causing a fiery explosion and killing Martin. (*Id.*) Plaintiffs' expert said the fumes did not come from the car's fuel tank or a malfunctioning fuel line; rather, he determined that gasoline or other liquid fuel had escaped or been spilled from one or more non-standard plastic containers in the passenger compartment, and was also on Martin's clothing. (Docket nos. 62-1, 1:19–20; 68-20, 6–7.) The expert did not determine how gasoline spilled or escaped, why it was on Martin's clothing, or the amount he was carrying in the passenger compartment.  (*Id.*)  But based on the fire's size and duration, it was clearly substantial.

The video vividly shows that the explosion was forceful and violent, and that intense fire immediately engulfed the car's interior and billowed outward from the windows for many minutes. The explosion's force blew the glass out of all four windows (Docket no. 68-20, 6) and knocked Agent Salcedo to the ground, causing his vision to blur, and burning his hands, face, neck, and hair. (Docket no. 62-5, ¶ 17; Video 18, 00:45–50.) In the video, Salcedo can be seen covering his eyes and staggering immediately after the explosion (Video 18,

---

[5] Plaintiffs characterize the testimony as saying that, to open the windows, Martin would have had to "move his hand down and move his hand to the side." (Docket no. 68, 12:8–10 (citing Docket no. 68–6, 171:5–15).) But this characterization omits the crucial word "left" and replaces it with the ambiguous "side."  The actual testimony was that Martin "would have to put his hand down and move it somewhere to the left . . . " — *i.e.*, towards the driver-side door. (*Id.*, 171:5–8; *see also id.* at 171:12–15 (Fishman's testimony that he thought the window controls were located on the driver's side door).)

[6] This was less than thirty seconds after Martin's car had been forced to stop.

00:50–56) and, a few minutes later, with injuries to his face. (*Id.*, 7:05–46.) Agent Fishman heard popping noises coming from Martin's car, prompting him to move his own car to a safe location. (Docket no. 62-2, ¶ 24.) The Agents who had been near the car jumped back quickly, retreated to a safe distance, and called firefighters for assistance. (Video 18, 00:50–3:10; Docket nos. 62-2, ¶ 24; 62-5, ¶ 17; and 62-7, ¶ 10.) A second explosion occurred less than six minutes after the initial blast. (Video 18, 6:08.) Firefighters, using a fire hose, spent at least six minutes extinguishing the fire. (Video 18, 20:02–26:02.)

### B.   Factual Disputes and Other Evidence

#### 1. Whether the Wrong-Way Driver Was Martin

Plaintiffs dispute that the wrong-way driver was Martin, and posit that the Agents could have been following some other driver during part of the case.[7] (Docket no. 68, 7 n.2). They also suggest that, because Martin was seen somewhere east of that location over an hour earlier,[8] there is a dispute about whether he was the driver going west in the eastbound lane. (*Id.*) But the point here is not whether Martin was the wrong-way driver; rather it is

/ / /

---

[7] Plaintiffs claim there is evidence Agent Fishman recognized Martin's car solely by its taillights and had no idea what the car itself looked like. (Docket no. 68 at 6:23–27, 20:11-13, 20:19–21.) But the evidence they cite, deposition and interview transcripts, doesn't support this argument. The deposition transcript includes only the attorney's suggestion to Fishman that the taillights were his only reason for believing the driver was Martin, and Fishman's answer is cut off. (*See* Docket no. 68-6 at 20–21 (Fishman Depo. Tr. at 128, 131).) Fishman's deposition testimony merely says that he <u>initially</u> saw only the lights, but later he was able to provide more details. (*See id.* at 127:25–128:4 (testifying that he could not identify the make of the car or provide a license plate number early in the pursuit, but that he could identify the car's size and give them a location).) In the interview, Fishman says he <u>did</u> get a look at some details of the car, when its brake lights lit up. (Docket no. 68-7 at 20 (Fishman Interview Tr. at 19) (". . . I could see the trunk part light up when he hit the brakes so I kind of knew, I knew what kind of brake lights it was and what it looked like.")) He affirmed this testimony during his deposition. (Docket no. 68-6, 131:4–25.)

[8] It is hard to know what to make of this point. Plaintiffs point out Martin passed through another Border Patrol checkpoint on the I-8 freeway, east of that location, at about 10:49 p.m. Between 11:30 p.m. and midnight he was apparently lost in a residential neighborhood near Exit 79, which is west of the Pine Valley area. (*See* Docket 68, 5:19–6:7.) Then some time after midnight he was again in the Pine Valley area, which means he must have traveled east after leaving the neighborhood. He likely did this by mistake, since he was trying to get to San Diego, and should have gone west. Had he realized his mistake and turned around, he would have been going west again, which is the same direction the wrong-way driver was going. This does not prove Martin was the wrong-way driver, but it is entirely consistent with his being the wrong-way driver.

whether the Agents reasonably thought he was. This case, after all, turns on whether the Agents were reasonable, not whether in hindsight they were right.

Fishman was tailing Martin, and lost sight of him only temporarily. At the time, it is undisputed that there were only "one or two" other civilian cars on the highway. (Docket no. 68, 7:11–12.) The wrong-way car and Martin's looked similar, and Martin's car was where the wrong-way driver's would have been expected to be. Also, Martin's parking on the side of I-8 near an exit could reasonably suggest that he was lost or confused. Later, the Agents saw Martin drove with extreme recklessness, just as the wrong-way driver had done. The evidence is not in dispute that by the time Martin's car was finally forced off the road, the officers had reason to believe that the driver they had been following the whole time was Martin.

**2. Martin's Frame of Mind and Reasons for Being There**

The parties also discuss at length how Martin came to be on that stretch of highway, his purpose for being there, and his frame of mind. But those facts have no real bearing on the summary judgment motion, because the standards preclude the Court from relying on them. Plaintiffs have offered evidence that he was driving to San Diego to visit friends, and mention an uneventful stop earlier that day at a Border Patrol station in Las Cruces, New Mexico. They point to evidence suggesting that about half an hour before midnight, Martin may have gotten turned around and needed directions to get back on the interstate.

Defendants point to evidence that two months earlier Martin pled nolo contendere to a charge of driving while intoxicated with an open container in the car, that he had fled from police on that occasion, and that he had had a gun in the car. They point out that as a result, Martin was prohibited from driving a vehicle unless it was equipped with a breathalyzer. They mention the undisputed fact that Martin rented a car in Dallas at 1:02 a.m. on March 14 — the same car he drove to California in — and it was not equipped with the required device.  They also suggest Martin's behavior was unusual, in that he rented the car for only two days and did not tell his parents about the trip. They cite bizarre documents Martin took

/ / /

with him, apparently suggesting Martin may have feared or hated police, or that he might have been unbalanced.

The Court need not resolve the issue of why Martin was there, how he came to be driving the wrong way on the interstate, or what his frame of mind was. The summary judgment standards do not permit the Court to resolve evidentiary disputes or weigh the evidence. But in any event, what matters for purpose of this case is what the Agents knew or had reason to believe, and they knew nothing about any of this at the time.

### 3. Inconsistencies in the Agents' Accounts

Plaintiffs rely heavily on the theory that the Agents stealthily approached Martin and pointed guns at him, causing him to be afraid and flee, and that this explains why he fled when first stopped, and why he then attempted to evade the Agents and did not stop until forced to. In support of this, Plaintiffs point to inconsistencies in the Agents' accounts about whether the Agents displayed badges and whether they pointed guns when they stopped him at first. Whether these truly are inconsistencies would, of course, be for a jury to decide. But even supposing Martin was initially afraid of the Agents, and even accepting inconsistent accounts as evidence that they were conscious they had not followed department policy, there is no dispute that, from the Agents' point of view, Martin appeared to be fleeing to avoid lawful capture.

Accepting Plaintiffs' account as true, Martin was parked by the side of I-8, near the Pine Valley exit sign when Fishman, believing this was the wrong-way driver, pulled up behind him and turned off his lights. (Docket no. 68, 7:13–8:4.) Martin then drove to a cul-de-sac and stopped, and Fishman followed him, his lights still off. Plaintiffs suggest because Martin didn't realize Fishman was a law enforcement agent, he became afraid at this point. But then, when Martin drove up the on-ramp, Fishman turned on his flashing lights, and other Border Patrol vehicles showed up. And from this point on, we have video footage to rely on. (Video 19 at 27:00.) The video footage shows both Fishman's and Salcedo's cars with flashing red and blue lights, as well as a marked Border Patrol vehicle on the road directly ahead of Martin, also with flashing lights. Even if the Agents did not display badges or

verbally identify themselves as law enforcement, the lights and marked vehicle would have made it clear.

In the footage, Martin can be seen driving away as soon as Salcedo's car drove up, and before anyone approached his car. Even assuming the Agents there drew their weapons, they were not close enough to Martin to even appear in the video, and in any event it would have been unclear to the Agents that Martin, with bright lights shining on his vehicle, could even see them. From that point on, to a reasonable officer on the scene, it would not have appeared that Martin was fleeing for some innocent reason. From this point on, he had every reason to know he was being pursued by law enforcement. (*See* Docket no. 68, 7–11.)

And after this point, Plaintiffs' position becomes even weaker. Martin continued to flee, and began taking desperate measures to evade not only the Agents who were pursuing him, but others as well.  Martin did not stop when he reached the clearly-marked official Border Patrol checkpoint, or ask any of the agents there for help. Instead, he skirted it and sped on. Certainly by the time the Agents forced Martin's car off the road, they had no reason to think he believed they were anything other than law enforcement officers or that he was fleeing for any reason other than to evade capture. From their point of view, Martin realized they were law enforcement officers, and fled either in spite of or because of that fact. Furthermore, in light of Martin's extremely reckless driving as seen in the video, a reasonable officer could have determined that Martin could not be allowed to drive on, but had to be removed from behind the wheel before he injured or killed someone.

Violations of badge policy or failure to identify themselves as Border Patrol Agents might have been reasons to discipline the Agents, but they make no difference to the outcome of this case. Nor do any conflicts in the Agents' testimony support a "consciousness of guilt" theory as Plaintiffs argue. (*See* Docket no. 68, 2:25–28.) In the absence of evidence showing why the Agents gave an incomplete or contradictory account, jurors would merely be speculating about their motives. *See Gonzalez*, 747 F.3d at 797–98; *Karam*, 352 F.3d at 1194. But even if jurors concluded the Agents were lying because they were conscious of wrongdoing, their own opinions about their actions, or feelings of guilt are irrelevant to this

case. *See Graham*, 490 U.S. at 399 ("The Fourth Amendment inquiry is one of objective reasonableness under the circumstances, and subjective concepts . . . have no proper place in that inquiry.")

## A.     Qualified Immunity

Defendants argue that qualified immunity bars Plaintiffs' *Bivens* claims because Defendants did not violate Martin's Fourth Amendment right to be free from excessive force, and that the force used — a taser in dart mode — was objectively reasonable.

Plaintiffs' opposition focuses on Martin's perception of his actions, such as whether Martin subjectively knew he was being pursued by Border Patrol agents, or why Martin reached for the center console instead of the door. But Martin's own perception is not at issue; what's relevant is how a reasonable officer would perceive his actions. *See Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015) (directing courts to consider "the threat reasonably perceived by the officer"); *Deorle v. Rutherford*, 272 F.3d 1272,1280 (9th Cir. 2001) ("[A]n officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts.")

### 1.     Excessive Force Under the Fourth Amendment

Courts consider three nonexclusive factors in assessing the government's interest in use of force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 396).These factors are evaluated in light of the totality of the circumstances. *Deorle,* 272 F.3d at 1280.

### a.     Governmental Interest in the Use of Force

### i.     Severity of Crime at Issue

The "severity of the crime" refers to the severity of the suspected crime. *See Muehler v. Mena*, 544 U.S. 93, 108 (2005). The Agents suspected Martin of smuggling drugs or aliens, both of which are felonies.  The Agents also knew that if he was smuggling aliens, his extremely reckless driving was putting their lives at risk, which is an aggravating factor in

1  alien-smuggling cases.  They also knew he was attempting to evade them, and driving with

2  extreme recklessness. These are

3  serious crimes, and weigh in favor of the government's interest in the use of force to

4  apprehend Martin.

5                              **ii.        Threat to Safety of Agents or Others**

6            Martin's driving posed a clear and immediate danger to the public and presented an

7  objectively serious hazard. *See Harris*, 550 U.S. at 379. Even accepting, *arguendo*, Plaintiffs'

8  argument that some other driver was the wrong-way driver on the interstate, the video makes

9  absolutely clear Martin's driving put many people in danger of serious injury or death. It also

10  displayed a willingness to take great risks to escape, and this threat continued until the very

11  moment he was tasered. Martin maintained control of the car at all times. He never left it, and

12  his keys remained in the ignition. When his car was finally stopped, three vehicles largely

13  hemmed him in, but even then the Agents had no assurance he would not try to escape

14  again by stepping on the gas pedal and ramming his car into surrounding agents or their

15  vehicles, perhaps seriously injuring or killing the agents or any aliens hidden in his vehicle.

16  *See Mattos v. Agarano*, 661 F.3d 433, 444 (9th Cir. 2011) (en banc) (suggesting that a

17  person may pose an immediate or even a potential threat by sitting in their car, since "[i]n

18  theory, they may attempt to drive away rapidly and recklessly, threatening the safety of

19  bystanders or the officers") Although suspects surrounded by parked law enforcement

20  vehicles do not usually ram them in an effort to escape, it is a known risk — particularly if the

21  suspect is desperate. *See, e.g., United States v.* Webster, 625 F.3d 439, 441 (8th Cir. 2010)

22  (suspect, when surrounded by patrol cars, "put his truck in reverse and rammed into the

23  police SUV behind him in an unsuccessful bid to escape"); *United States v. Acevedo-Bruce*,

24  209 Fed. App'x 197, 199 (3d Cir. 2006) (suspect attempted to use his car to push police car

25  out of the way so he could escape); *Priah v. United States*, 590 F. Supp. 2d 920, 944 (N.D.

26  Ohio, 2008) (in an effort to avoid imminent arrest, suspect rammed and broke through barrier

27  / / /

28  of occupied FBI vehicles). This threat was reinforced by Martin's reckless driving, which led

1   Agents to suspect he was a smuggler and was intent on avoiding prosecution at any cost.

2       After the stop, Agent Salcedo also had reason to fear Martin might be attempting to

3   attack him. There is no dispute that Martin reached toward the car's center console. Even

4   if there is some innocent explanation for this, the Agents would not have known what it was.

5   There is no evidence Salcedo, the agent who fired the taser, thought the car's window or

6   door controls were located in the console, or that by rummaging around there Martin was

7   trying to cooperate by opening the door or window.  In light of earlier events, a reasonable

8   officer in Salcedo's position could have reasonably feared Martin was reaching for a pistol

9   or other weapon and intermediate force was necessary to incapacitate him.

10      It should also be mentioned that the Agents were necessarily acting quickly, in a tense

11  situation and with no time to reflect or consider any alternatives. The detailed description

12  provided in the briefing might give the impression that this was a relatively leisurely stop. But

13  in fact events unfolded quickly. From the time Martin's car was forced off the road and came

14  to a stop until the time Agent Salcedo fired his taser, no more than thirty seconds passed.

15      The Agents had good reason to fear Martin would harm them or others if not

16  immediately stopped. This factor — the most important — weighs in favor of the

17  government's interest. *See Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

18                  **iii.      Actively Resisting Arrest or Attempting to Evade**

19      The Ninth Circuit distinguishes "passive and active resistance." *Bryan v. McPherson*,

20  630 F.3d 805, 830 (9th Cir. 2010). Resistance "should not be understood as a binary state,

21  with resistance being either completely passive or active. Rather, it runs the gamut from the

22  purely passive protestor who simply refuses to stand, to the individual who is physically

23  assaulting the officer." *Id.* Ultimately, "the level of force an individual's resistance will support

24  is dependent on the factual circumstances underlying that resistance." *Id.*

25      The *Mattos* plaintiff was in her car, stiffened her body, and clutched the steering

26  wheel, making it difficult for officers to remove her.  The Court reasoned that the plaintiff's

27  / / /

28  "resistance did not involve any violent actions towards the officers." *Id.* at 445. Yet, the Court

found she actively resisted. *Id.* at 446.

Martin was even more uncooperative. He had just engaged in a lengthy chase, in an effort to evade authorities, and only stopped when forced to. His doors were locked, and he appeared to be defying the Agents' commands to get out of the car and show his hands. His reach or lunge — under these circumstances — presented an objective threat, which Agents reasonably believed had to be neutralized. Plaintiffs propose that Martin was trying to obey commands by unlocking his door, but there's no evidence that Agent Salcedo knew this. *See, e.g.*, *City & County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1770 (2015) (focusing qualified immunity analysis solely on what officers knew).

What's relevant is whether a reasonable agent in Salcedo's shoes would perceive Martin's actions to constitute resistance. *Id.* at 1778 (holding that the officers "specific situation" gave them "sufficient reason to believe that their conduct was justified"). Context matters when assessing reasonableness. Here, a suspected smuggler displaying an objective determination to flee Agents — even at the risk of seriously injuring or killing himself or others — could have reasonably led an Agent to believe Martin might be resisting arrest by reaching for a weapon.

The second part of this factor, attempts to evade officers, also weighs in favor of the government's interest. Martin displayed a clear intent to evade the Agents, and from their perspective very likely still intended to escape, if he could. Both parts of this factor weigh in favor of the government's interest.

### iv.   Warnings and Culpability

Courts may consider other factors when assessing reasonableness, such as lack of an adequate warning by law enforcement and culpability. *Harris,* 550 U.S. at 384. The Ninth Circuit has said that warnings should be given, when feasible, when less than deadly force is used, but has not held that they are required. *Deorle*, 272 F.3d at 1284. The lack of a warning is considered as part of the reasonableness analysis. *See Mattos*, 661 F.3d at 541. Here, Martin was tasered almost immediately after he was stopped, and while he appeared to be reaching for something, in apparent violation of the Agents' commands. Even if

13cv1386

Salcedo's own account of something in Martin's hand that could have been a weapon is disregarded, there is no dispute that Martin made a reaching motion toward the center of the car.  A reasonable officer in Salcedo's position could have reasonably feared Martin was reaching for a weapon, and that immediate action was required.  Under the circumstances, it was not feasible for Agent Salcedo to give a warning.

Plaintiffs argue that the Agents' failure to identify themselves adequately makes them relatively more culpable.

The parties' relative culpability, that is, "which party created the dangerous situation and which party is more innocent, may also be considered." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). Defendants' use of some unmarked vehicles, and failure to display badges or identify themselves as clearly as they might does play a part in this analysis, but it pales in comparison to Martin's culpability. He initiated a reckless car chase that Agents could hardly ignore, and bears primary responsibility for the escalation of this incident. *See Mattos*, 661 F.3d at 445. Neither of these factors weigh in Plaintiffs' favor.

### b.    Nature and Quality of Intrusion

Agent Salcedo restrained Martin by firing a non-lethal taser in dart mode — an "intermediate, significant level of force." *Bryan*, 630 F.3d at 826. Plaintiffs acknowledge this, but also argue that using a taser in dart mode near flammable material constitutes deadly force.

In support, Plaintiffs cite *Brown v. Burghart*, 2012 WL 1900603 (E.D. Pa. May 25, 2012), a case where officers tasered a gasoline-soaked plaintiff near his overturned scooter leaking gasoline. *Brown* rested on the foreseeability of the risk of an explosion, and is easily distinguishable. *See id.* at 8. A gasoline leaking fuel presents an obvious danger. But here, the Agents had no reason to expect they'd find a fume-filled vehicle with substantial amounts of gasoline stored in the passenger compartment, and a driver with gasoline on his clothes. (*See* Expert Report, "Combustible gases and liquids are not normally present in an automobile passenger compartment in quantities sufficient to be ignited.")

Plaintiffs argue that the Agents would have smelled the fumes. But there's no

evidence the Agents smelled gasoline fumes either before, or after breaking Martin's car's window. All the windows were closed until Agent Salcedo broke one with his flashlight. And even then, Plaintiff's expert's report says the fumes would have exited the car at the top of the window while fresh air from the outside was drawn in through the bottom of the window. (Docket no. 68-20, at 8.) But the video does not suggest, and no other evidence shows, that Agent Salcedo or any other Agent was standing where he could have smelled the exiting fumes. And Salcedo did not remember checking for gas fumes. (Docket no. 68:15–16 (citing Salcedo Depo. 228:23–25).)[9] Furthermore, Agent Salcedo was focused on Martin and his actions, and fired the taser only a moment after breaking the window.

Under the circumstances, neither Agent Salcedo nor any other Agent knew or had reason to know that a fire would result or that the car would explode. It is also worth noting that Agent Salcedo was standing very close to the car, and the explosion knocked him to the ground. Several other agents were standing or pacing nearby, and immediately after the explosion they all jumped back quickly. Clearly, none of them were expecting the taser to cause an explosion. The Fourth Amendment can only be violated by the <u>intentional</u> use of force. *Dimmig v. Cnty. of Pima*, 659 Fed. Appx. 540, 541 (9th Cir. 2014) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989); *Byars v. United States*, 273 U.S. 28, 33 (1927)). There is no evidence here that the fire and explosion were intentional, or even negligent.

### c.   Balancing

Because the Agents responded to Martin's threatening behavior with only an intermediate level of force, and because all *Graham* factors weigh in favor of the government's interest, the Court finds that no rational juror could find that the use of a taser in dart mode was unreasonable, or that the resulting explosion and fire that killed Martin were intentional or even negligent.

///

### 2.   The Right Wasn't Clearly Established

---

[9] Salcedo was asked whether, after breaking the window, he smelled to see if there was gas inside the car before firing his taser, and said he did not remember. (Salcedo Decl., 228:15–25.)

Even if Plaintiffs had shown a violation of Martin's Fourth Amendment rights, reasonable agents in Defendants' position would not have clearly known that they violated his rights.  *See Graham*, 490 U.S. at 396.   As shown by undisputed evidence, and as the video makes clear, this was a classic example of a "tense, uncertain, and rapidly evolving" situation, and officers had only a few seconds to decide how to respond. *See id.*

This case is unlike *Bryan*. Here, the situation was more than uncertain; it was potentially deadly. *Cf. Bryan*, 630 F.3d at 832 ("Bryan never attempted to flee. He was clearly unarmed and was standing, without advancing in any direction, next to his vehicle.") Any law that might have forbidden Agent Salcedo to act as he did was therefore, at best, unclear. *See id.* at 833 (citing cases for the principle that "the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity").

Since the remaining *Bivens* claims stem from the excessive force claim, they all fail. *See Santana v. City of Hartford*, 283 F. Supp. 2d 720, 728 (D. Conn. 2003). Furthermore, Defendants' summary judgment motion was unopposed as to the fourth *Bivens* claim. The Agents are therefore entitled to qualified immunity on all the *Bivens* claims.

**B.    FTCA Claims**

**1.    Excessive Force and Assault and Battery**

Under California law, claims for assault, battery, and excessive force are analyzed using the same standards as Fourth Amendment excessive force claims.  *See Saman v. Robbins*, 173 F.3d 1150, 1156–57 & n.6 (9th Cir. 1999) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (Cal. App. 4 Dist. 1998)). Because Plaintiffs' *Bivens* excessive force claim fails, his FTCA claims must under these theories also fail.

**2.    Negligence**

Defendants move for summary judgment on Plaintiffs' negligence claim. This includes actions involving pre-tasering and tasering conduct, as well as the Agents' failure to extinguish the fire from Martin's burning car, which allegedly would have saved his life.

/ / /

### a.   Tasering

The alleged pre-tasering failures to follow certain Border Patrol polices and procedures — such as not displaying badges, failure to identify as law enforcement, wearing plain clothes, using unmarked cars — caused no injury independent of the tasering itself. The pre-tasering and tasering analyses then collapse into one; the pre-tasering events may only be considered as part of the totality of circumstances.

As noted, no reasonable person in Martin's position would have doubted they were law enforcement agents.  Yet in order to recover on a negligence theory, Plaintiffs would need to show, not only that Martin thought this, but that the Agents unreasonably failed to realize that is what he thought. They have pointed to no evidence to support such a finding.

Agent Salcedo reasonably feared Martin was reaching for a weapon when he tasered him, and that objective threat caused him to fire it. There is no evidence he had reason to believe a fire or explosion would result.  Since there is no nexus between the Agents' pre-tasering actions and the reasonableness of Agent Salcedo's act, and because the Court has already found the tasering itself was reasonable, this claim fails too.

### b.   Extinguishing the Car Fire

Plaintiffs suggest the Agents could have saved Martin's life by using a fire extinguisher or by pulling him from his car. This claim is unsupported by competent evidence, and contradicted by undisputed evidence, including the video.

Firefighters spent at least six minutes hosing down Martin's car, trying to extinguish the flames. The Agents had only a fire extinguisher and there's no reason to suppose it would have put out the fire or helped Martin survive. And removing Martin was impossible unless the Agents risked serious burns or death. The video shows huge, violent flames filling the car and billowing from the its windows. To attempt a rescue, the Agents would have had to enter this inferno, either unlock and open the door or climb through the broken window, find Martin in the midst of the flames, and drag him out — an impossible and almost certainly deadly task. What is more, Agent Fishman's fears of a secondary explosion, aroused by popping noises from Martin's car, were well-founded. Shortly after the initial explosion, there *was* a

second blast, which might have killed or injured any rescuers or bystanders. Finally, the explosion was sudden and violent. There is no reason to suppose that Martin could have survived it, or even if he did, that he could have survived the resulting conflagration long enough for anyone to rescue him. No rational juror could find that the Agents could or should have attempted a rescue, or even that rescue was possible.

### 3. Wrongful Death

A plaintiff establishes a claim for wrongful death by demonstrating a "tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (Cal. Ct. App. 2006). Because the negligence claim fails, this claim also fails.

## IV. Conclusion

The Court **GRANTS** summary judgment on all of Plaintiffs' claims against all Defendants.  This action is **DISMISSED WITH PREJUDICE** and the Clerk is directed to enter judgment for Defendants on all claims.

**IT IS SO ORDERED**.

DATED:  September 18, 2015

**HONORABLE LARRY ALAN BURNS**
United States District Judge

13cv1386